Filed 5/20/15  P. v. Ortiz CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>SANTIAGO GONZALEZ ORTIZ et al.,<br><br>        Defendants and Appellants. | H039152<br>(Monterey County<br>Super. Ct. Nos. SS102081A & B,<br>SS120447A & B) |

Appellants Santiago Gonzalez Ortiz and Ricardo Martinez (collectively appellants) appeal their convictions for premeditated murder (Pen. Code, § 187, subd. (a)),[1] shooting at an occupied motor vehicle (§ 246), and active participation in a criminal street gang (§ 186.22, subd. (a)).

Appellants raise numerous issues on appeal, which we shall outline later.  For reasons that follow, we reverse and remand for a limited purpose.

*Facts and Proceedings Below*

On July 28, 2010, 16-year-old Frankie Sanchez Jr. was in the driveway of Gerry Montanez's house on Capitol Street in Salinas; Montanez was Sanchez's relative. The neighborhood where the house was located was in Norteño territory.  Sanchez was watching Montanez work on a white Cadillac.  Montanez was an active Norteño gang member; Sanchez was a "wannabe" who had friends that were Norteños and friends from the rival gang the Sureños.  Sanchez's best friend, Lorenzo B., a Norteño gang member

_____

[1]  All unspecified section references are to the Penal Code.

who lived across the street from Sanchez, came over to watch Montanez work on the car and "hang out."

Sanchez and Lorenzo were sitting in the Cadillac listening to music while Montanez was working under the hood. Lorenzo's stepfather called his son back to their house across the street to help him close the garage door; Lorenzo went to help. Sanchez remained in the front seat of the car while Montanez remained working under the hood of the Cadillac. As he passed by the front yard of his house Lorenzo noticed that the windows to his family's Volkswagen were not rolled up, so he got the keys from his mother and headed outside to close the windows.[2]

Meanwhile, defendant Ortiz crept over to the Cadillac and pulled out a gun from his waistband. Ortiz shot at Sanchez twice through the back passenger door on the driver's side of the vehicle. The first bullet shattered the glass and passed through the front passenger seat and into the front passenger side door. The second shot, which was fired from about three feet away, went into Sanchez's head. Ortiz walked back onto the street as codefendant Martinez pulled up. Ortiz got into the back seat of the car. As another man started approaching the car, Montejano threw a gang sign and Martinez drove off.

Three eyewitnesses saw the shooting and/or the shooter leaving the scene. Lorenzo had just got into the Volkswagen in his front yard, started the car in order to roll up the windows, and bent down, when he heard a big "pop" from across the street. He

---

[2] The testimony about what happened before and after the shooting and some of what happened at the scene came from two former codefendants—Roberto Montejano and Alberto Prado, both of whom were originally charged with murder. Both men took plea deals in exchange for their truthful testimony. Montejano pleaded guilty to assault with a deadly weapon for the benefit of a criminal street gang in exchange for a maximum sentence of eight years. Prado pleaded guilty to conspiracy to commit assault with a firearm for the benefit of a criminal street gang in exchange for a maximum sentence of eight years.

looked up to see a person in a dark "hoodie" shooting at the Cadillac from approximately eight to 10 feet away. He saw the person take a few steps closer, shoot a second time, and then run back toward the middle of the street; the person appeared to be a mid-dark-skinned male, but not an African American. Lorenzo saw a silver four-door car drive up the street toward the shooter. The shooter opened the door and got into the back seat behind the driver; the car drove away.

Another eyewitness, Pedro Bonilla, heard two gunshots while he was standing having a cigarette in the area of Capitol and Market Street. As he turned in the direction of the sound, Bonilla saw a Latino male, about 19 to 20 years old; he was wearing a white shirt and had a gun in his hand. The man was coming onto the sidewalk from the left-hand side of Capitol. Bonilla, who was a gun owner, thought he recognized the gunshots as coming from a revolver. In addition to the man, Bonilla saw a four-door car pull out of the U-Haul lot farther down the street from him and drive toward the shooter; he thought the car was beige in color. The car stopped, and the shooter got into the rear of the car and drove away.

Carl M., Lorenzo's stepfather came out of his house in time to see the shooter walk from the Cadillac to a silver four-door car; the shooter fumbled with the left rear passenger door, but eventually got into the car. Lorenzo, Carl and Bonilla all heard Montanez shouting that Sanchez had been shot.

An autopsy revealed that Sanchez died from a bullet that was shot into his head. The bullet entered Sanchez's right temple traveled through his brain causing multiple fractures to the skull; the bullet transected, lacerated, and obliterated various parts of Sanchez's brain. The bullet that was recovered was a .44-caliber hollow-point bullet.

*Evidence of Planning Before the Shooting*

According to Montejano, the motive for the shooting was retaliation for the shooting of a Mexican Pride Locos (MPL) gang member. However, Martinez's girlfriend Elizabeth Mendoza explained that earlier in the day on July 28 she had been in

3

Martinez's car while Martinez was driving through a Norteño neighborhood "blaring" Sureño rap music. After getting shouted at while driving in the Norteño neighborhood, they returned home. Martinez started saying things such as "fuck Norteños, fuck busters . . . ." Martinez began making telephone calls. Then, he drove his gray car to the house of fellow MPL member Ortiz, where he met Ortiz and Prado.[3] Prado lived in the same house as Ortiz. Prado saw Martinez outside and went to talk to him. Martinez was already talking to Ortiz. Martinez told Prado about someone shooting at their friend's house; he invited Prado and Ortiz to join him in retaliating. Prado went back inside and got the keys to his blue Chrysler car and drove with Ortiz to where Martinez lived. They waited outside until Martinez arrived; Montejano was with him.[4] All four men went into the house after Martinez took the bullets out from under the gas cap of the car.

Martinez lived with his girlfriend Mendoza in one room that had a curtain down the middle, which could be closed in order to divide the room in two. When the men got inside they found Mendoza and a family friend, "Trina"; they were listening to music and folding laundry on one side of the room. The men went to the other side of the room divider, which was open, but not all the way. Once there, Martinez tried telephoning Magic and Smiley,[5] but they did not answer their telephones. Ortiz proposed that the

---

[3] Several witnesses identified Martinez as an MPL gang member. He had a tattoo of MPL on his stomach and three dots on his left eye. He admitted to others that he was a Sureño gang member. Similarly, several witnesses identified Ortiz as an MPL gang member. Ortiz had tattoos of one dot above his right eye and three dots below his left eye—the Sureño signature tattoo and MPL tattooed on his neck. Ortiz introduced himself to others as "Shaggy" from the "Mexican Pride Locos." Prado was an MPL associate.

[4] Montejano testified that "Magic" and "Smiley" telephoned him and asked him to bring over some bullets so that they could try out a gun. Montejano went outside and gave the bullets to Smiley. Martinez came by in a grey car with another gang member by the name of "Shy Boy"; Montejano got into the back of the grey car. They dropped off Shy Boy at his house; Shy Boy had the bullets and gave them to Martinez, who hid them under the gas cap of the car. Eventually, they drove to Martinez's house.

[5] The record does not indicate Magic's or Smiley's real names. Accordingly, we must refer to them by their gang monikers.

4

four of them could do the shooting by themselves; Martinez, Prado and Montejano agreed. Martinez said that the shooting was to be in retaliation for a prior shooting at a Sureño house. Martinez took a small black revolver and a longer rifle-sized firearm from his closet. The revolver contained two .44-caliber bullets. Martinez tried to load the revolver with the .45-caliber bullets that Montejano had supplied, but they did not fit the revolver. Martinez reloaded the revolver with the two .44-caliber bullets and passed the gun around the group so they could feel how it felt in their hands.

The group discussed who would be the one to do the shooting. Martinez said that he had passed a group of Norteños on Capitol Street. Montejano said that they would be "easy targets." Both Martinez and Ortiz wanted to do the shooting, but the group decided that Ortiz would shoot the gun. Prado said that the longer gun would be too big to take, so Martinez put it back in the closet and Ortiz took the revolver. As the men were leaving, Martinez told Trina and Mendoza that they were going to "go hunt" and that they would be right back. The men left in two cars; Ortiz and Prado went in the blue car and Montejano and Martinez went in Martinez's car.

According to their plan, Prado would drop off Ortiz, and then after the shooting Martinez would pick up Ortiz. The two cars stopped at a park near Capitol Street to coordinate a more precise drop-off point. As planned, Martinez waited with the getaway car at a U-Haul lot down the street from the target, while Prado drove past the target and dropped off Ortiz at a stop sign on Capitol Street. After Ortiz got out of Prado's car, Prado drove away. Prado saw Ortiz walk toward the back of his car and go south on Capitol Street. Martinez pulled his car into the U-Haul lot and turned his car around to face forward; they had a clear view of a white Cadillac. Montejano saw Ortiz approaching the house with the Cadillac; Ortiz pulled out the gun and shot twice through the back passenger window on the driver's side. Montejano saw Ortiz fire one shot, move closer, and then fire another shot.

5

*After the Shooting*

Martinez dropped off Ortiz at Martinez's house while he and Montejano went to park the car farther down the street. Martinez, Ortiz and Montejano went into the house where Mendoza and Trina were still present. The three men went to the other side of the divider. They were happy and excited. Ortiz pulled the revolver out of his waistband and explained and reenacted how he had aimed the gun at the victim's head. Ortiz changed out of his pants and put on some of Martinez's sweatpants. Martinez and Ortiz told Mendoza to get rid of Ortiz's clothing; they explained that Ortiz had just shot a Norteño and that the clothes might have gunpowder residue.[6] Martinez took the bullet casings out of the revolver, flushed them down the toilet, and hid the gun in the closet after wiping it down with a sock. Martinez was excited and they were "pumped up." They drank some alcohol to celebrate and the conversation quickly moved on to the topic of getting to Shy Boy's house for a party.

A few days later, Ortiz confided in Mendoza that he felt haunted by the person he shot; however, he said he wanted to get a teardrop tattoo, which was something he always wanted.[7] Martinez showed Prado a photograph of the victim; he said that another Sureño gang—Hebbron—was trying to take credit for the shooting. Later, before they were all arrested for the murder, Prado went to pick up Martinez from Fresno. Again, Martinez told him that Hebbron was trying to take credit for the shooting.

The jury deliberated for slightly over one hour before returning guilty verdicts against Ortiz and Martinez for premeditated murder (count 1), shooting at an occupied motor vehicle (count 2), and active participation in a criminal street gang (count 3). As to

---

[6] Mendoza came back from Mexico to testify in this case. She had been deported after being arrested in an unrelated matter; she was in the California Witness Relocation and Assistance program.

[7] Mendoza explained that the teardrop tattoo was to symbolize that Ortiz had committed a murder.

Ortiz, the jury found true the allegations that the murder and shooting at an occupied vehicle were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)) and that Ortiz personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)).  As to Martinez, the jury found true the allegations that the murder and shooting at an occupied vehicle were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)) and that in the commission of the crimes of murder and shooting at an occupied vehicle a principal in the offense personally and intentionally discharged a firearm causing death.  (§ 12022.53, subd. (d),(e)(1).)

Subsequently, the court sentenced both Ortiz and Martinez to 50 years to life in state prison.  Martinez filed a timely notice of appeal, as did Ortiz.

*Discussion*

*Speedy Trial Claim*

Appellants claim that the court erred by denying their request to dismiss this case for failure to commence the trial before the expiration of section 1382's statutory time limit.[8]

On June 26, 2012, both Ortiz and Martinez waived their speedy trial rights and the court set October 15, 2012, as the trial date.  On August 14, 2012, both Ortiz and Martinez withdrew their time waivers.

On October 15, 2012, the court discussed in limine motions with the parties in chambers; and Ortiz and Martinez were brought to the courtroom dressed in plain clothes. The court called the case, introduced the parties and counsel to the prospective jurors, and explained to the jurors the anticipated schedule.  The court told those jurors who anticipated a hardship that they would be filling out questionnaires and that the court

---

[8]  Martinez has joined in the arguments advanced by Ortiz; however, he has not supplied any additional argument on the speedy trial issue.

7

would review another panel of jurors in two days;[9] and the unexcused jurors from both days would return the day after and that the presentation of evidence would begin on October 22. The parties evaluated the juror questionnaires and the court dismissed certain jurors based on their questionnaire answers. After the court released the jurors for the day, a clerk informed the court that the jurors had not been sworn. The court stated that it had not realized that the jurors had not been sworn and proposed to swear the jurors on Thursday October 18, 2012—the day that the prospective jurors from the two previous sessions would reconvene. Counsel for Ortiz and Martinez stated they were not prepared to waive any speedy trial issues. On October 18, 2012, the court swore in the prospective jurors from the two previous sessions and jury selection continued.

On October 22, 2012, counsel for Ortiz filed a motion to dismiss for failure to commence trial within the time limits of section 1382. In a recorded conference that was held in chambers, counsel for Martinez joined the motion and both counsel stated for the record that their clients had not waived their speedy trial rights. On October 24, 2012, the matter was heard and the court denied the speedy trial motion. The court reasoned that on October 15 there was an available courtroom, the court had committed resources to bring the case to trial by finding a judge to hear the case and scheduling a court reporter, the parties had stated their readiness on the record, the prospective jury panel was summoned and brought to the court, and the proceedings thereafter continued without delay. The court concluded that the trial had commenced for purposes of the defendants' speedy trial rights.

"The right to a speedy trial is a fundamental right. [Citation.] It is guaranteed by the state and federal Constitutions." (*Rhinehart v. Municipal Court* (1984) 35 Cal.3d

---

[9] The parties had agreed that court would not be in session on October 16, 2012, due to "counsel's scheduling conflicts." However, the case continued to progress on October 17 with another panel of prospective jurors called for voir dire.

8

772, 776 (*Rhinehart*), citing Cal. Const., art. I, § 15; U.S. Const., 6th Amend.) "The Legislature has also provided for ' "a speedy and public" trial as one of the fundamental rights preserved to a defendant in a criminal action. [Citation.]' [Citation.]" (*Rhinehart*, *supra*, at p. 776, citing § 686, subd. (1).)

The Legislature enacted section 1382 to codify and implement an accused's constitutional and statutory right to a speedy trial. (*Rhinehart*, *supra*, 35 Cal.3d at pp. 776, 783-784; *Sanchez v. Municipal Court* (1979) 97 Cal.App.3d 806, 810 (*Sanchez*).) That section, which prescribes certain time periods within which an accused must be "brought to trial," provides in part: "The court, unless good cause to the contrary is shown, shall order the action to be dismissed in the following cases: [¶] . . . [¶] (2) In a felony case, when a defendant is not brought to trial within 60 days of the defendant's arraignment on an . . . information . . . . However, an action shall not be dismissed under this paragraph if . . . the following circumstance[] exists: [¶] (A) The defendant enters a general waiver of the 60-day trial requirement. A general waiver of the 60-day trial requirement entitles the superior court to set or continue a trial date without the sanction of dismissal should the case fail to proceed on the date set for trial. If the defendant, after proper notice to all parties, later withdraws, in open court, his or her waiver in the superior court, the defendant shall be brought to trial within 60 days of the date of that withdrawal." (§ 1382, subd. (a)(2)(A).)

The limitations periods set forth in section 1382, subdivision (a)(2) for bringing a case to trial are not absolute, and an accused may be "brought to trial" beyond the applicable period "(1) for good cause, (2) at the request of the defendant, (3) with the defendant's consent, either express or implied, or (4) when the defendant fails to appear." (*People v. Malone* (1987) 192 Cal.App.3d 1096, 1103; see also *People v. Johnson* (1980) 26 Cal.3d 557, 569, [under the good cause provision of section 1382, subdivision (a), if a criminal case is brought to trial beyond the statutory time limit without the request or consent of the defendant, the court must dismiss the action unless good cause is shown].)

9

For purposes of section 1382, the California Supreme Court has explained that " ' [t]here is no talismanic phrase which can be used to describe the precise point at which an individual has been "brought to trial." The outside limits of the area can easily be established. A defendant has obviously been "brought to trial" when the judgment or verdict is rendered in the case. On the other hand, a defendant has certainly *not* been brought to trial prior to the day when the trial is scheduled and both parties appear and announce that they are ready to proceed.' " (*Rhinehart*, *supra*, 35 Cal.3d at p. 777, quoting *Sanchez*, *supra*, 97 Cal.App.3d at p. 810.)

In construing the phrase "brought to trial" in subdivision (a) of section 1382, the high court in *Rhinehart* stated that a defendant is "brought to trial" when "a case has been called for trial by a judge who is normally available and ready to try the case to conclusion. The court must have committed its resources to the trial, and the parties must be ready to proceed and a panel of prospective jurors must be summoned and sworn." (*Rhinehart*, *supra*, 35 Cal.3d at p. 780, fns. omitted; see also *Sanchez*, *supra*, 97 Cal.App.3d at p. 813, [a defendant is brought to trial within the meaning of section 1382 when the record objectively shows the case is assigned for trial to a judge who is available to try the case and the court has committed its resources to the trial, the parties answer ready, and a panel of prospective jurors is summoned and sworn].)

It is important to note that the language in *Rhinehart*, *supra*, 35 Cal.3d at page 780, stating that "a panel of prospective jurors must be summoned and sworn" in order for a defendant to have been brought to trial, is dicta. In *Rhinehart*, the jury selection had been *completed*; the problem was that the trial court had not committed its resources to the trial. (*Id*. at pp. 775.)[10] Accordingly, strictly speaking, *Rhinehart* stands only for the

---

[10] In *Rhinehart* the court concluded that merely selecting a jury was not sufficient under section 1382 because the trial court did not intend to proceed immediately with trying the case. (*Rhinehart*, *supra*, 35 Cal.3d at p. 780.) The trial judge had stated that the only reason for impaneling a jury was to avoid a dismissal under section 1382, and it (continued)

10

proposition that trial cannot be deemed to have commenced until the commitment of resources has taken place. (See *People v. Truman* (1992) 6 Cal.App.4th 1816, 1827, [referring to *Rhinehart*'s commitment of resources test].) Of course, we recognize that subsequent Supreme Court decisions have cited with approval the *Rhinehart* standard for when a defendant has been brought to trial. (See, e.g., *People v. Hajjaj* (2010) 50 Cal.4th 1184, 1196 (*Hajjaj*); *People v. Lewis* (2001) 25 Cal.4th 610, 629.) However, none of those cases involved circumstances akin to those in the present case, where the trial court at issue has committed its resources to the trial, but failed to swear in the prospective jurors who were called for voir dire. Neither are we aware of any decisions of the Courts of Appeal applying the *Rhinehart* standard in such circumstances.

While *Rhinehart* adopted the *Sanchez* test (*Hajjaj*, *supra*, 50 Cal.4th at p. 1195), it is important to note that in *Sanchez*, after the court outlined the elements of its brought-to-trial test, the *Sanchez* court went on to state "[i]n so holding, we do not mean to imply that these factors are the exclusive and *necessary* elements in all cases. Other possibilities will have to await future litigation. [¶] Furthermore, we do not rule out the possibility that in any given case subsequent events may disclose that the court was *not in fact available or ready to process the case to conclusion without unnecessary delay.* In such case it could then appear that the trial had not in fact commenced. But we reiterate

---

then resumed trying another case. (*Rhinehart*, *supra*, at p. 775.) As a consequence, the court in *Rhinehart* held that, although the trial court impaneled a jury on the last day to try the case, the court did not, in effect, bring the case to trial at that time because it did not commit its resources to the trial: "Under this test, it cannot be said that Mr. Rhinehart was 'brought to trial' within the meaning of section 1382. The trial judge indicated that the jury was impaneled solely to avoid a dismissal under section 1382. Moreover, the court was not available or ready to try the case to conclusion. The trial judge interrupted the trial in another case to conduct jury selection . . . . The next court day . . . the case was not reconvened at that time. It was continued . . . . Thus, Mr. Rhinehart was not 'brought to trial' within the meaning of section 1382." (*Id.* at p. 780.)

11

that such a determination must be made from the objective record." (*Sanchez*, *supra*, 97 Cal.App.3d at p. 813, italics added.)

Under the *Rhinehart* commitment-of-resources test, we have no doubt that appellants were brought to trial in this case on October 15, 2012. The parties had announced that they were ready. Retired Appellate Court Justice Duffy had been brought in specially to try the case; she had no other commitments scheduled and the case was assigned to her. The court had committed its resources to the case. The prospective jurors were called to the courtroom for voir dire—the only thing that was missing was that the court neglected to have the jurors sworn in. Given that the circumstances unequivocally demonstrate that appellants' case was called for trial on October 15, 2012, by a judge who was "available and ready to try the case to conclusion," appellants were brought to trial for purposes of section 1382. (*Rhinehart*, *supra*, 35 Cal.3d at p. 780.)[11]

*Aider and Abettor Liability*

Martinez argues that the trial court committed prejudicial instructional error by instructing the jury in a manner that permitted the jury to convict him as an aider and abettor of an implied malice murder where the natural and probable consequences doctrine was not invoked.

Martinez asserts that the case lent itself to two interpretations of the evidence. He, Ortiz, Prado, and Montejano decided individually and collectively that a Norteño should be killed in retaliation for the shooting into a Sureño's house or they decided that

---

[11] Appellants' complaints regarding the reliability of the voir dire and questionnaires absent a swearing-in oath is beside the point. The speedy trial analysis evaluates whether the proceedings have progressed with sufficient indications of good faith to conclude that appellants had been brought to trial. Concerns about the reliability of the proceedings are distinct from the question of whether the proceedings had begun. We note that none of the parties made a motion to disqualify for cause any of the unsworn prospective jurors who had answered the questionnaires or had responded to oral questioning in court. Furthermore, for the record, Ortiz's counsel observed that all jurors were sworn in by the time counsel conducted individual voir dire.

someone should shoot *at* a Norteño house.  Ortiz aimed and missed, but then after taking

careful aim with his second shot decided to kill Sanchez.

Martinez contends that Ortiz was guilty of premeditated and deliberate murder

under any view of the evidence based on the second shot with careful aim.  However, he

asserts that he (Martinez) was not guilty of first degree murder under the second view of

the evidence without reference to the natural and probable consequences doctrine on

which the jury was not instructed.

An aider and abettor may be convicted for crimes committed by the direct

perpetrator under two alternative theories:  direct aiding and abetting principles and the

natural and probable consequences doctrine.  (*People v. McCoy* (2001) 25 Cal.4th 1111,

1117-1118 (*McCoy*).)  Under direct aiding and abetting principles, the defendant is guilty

of the intended (or target) offense if he or she acted with knowledge of the criminal

purpose of the direct perpetrator and with an intent or purpose either of committing, or of

encouraging or facilitating commission of the target offense.  (*Id.* at p. 1118.)  However,

an aider and abettor can also be guilty of unintended crimes under the natural and

probable consequences doctrine:  when the aider and abettor acts with knowledge of the

criminal purpose of the direct perpetrator and with an intent or purpose either of

committing, or of encouraging or facilitating commission of the target offense, he or she

is guilty of both the intended crime and any other offense (the nontarget offense)

committed by his or her confederate that was a "natural and probable consequence" of the

target crime that he or she aided and abetted.  (*Id.* at p. 1117.)  "Thus, for example, if a

person aids and abets only an intended assault, but a murder results, that person may be

guilty of that murder, even if unintended, if it is a natural and probable consequence of

the intended assault. [Citation.]"  (*Ibid.*)  In *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*),

our Supreme Court held "that an aider and abettor may not be convicted of *first degree*

*premeditated* murder under the natural and probable consequences doctrine.  Rather, his

or her liability for that crime must be based on direct aiding and abetting principles.

13

[Citation.]" (*Id.* at pp. 158-159, some italics added.) The court did not disapprove use of the doctrine as it relates to *second degree* murder. It explained: "In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing. A primary rationale for punishing such aiders and abettors—to deter them from aiding or encouraging the commission of offenses—is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder. [Citation.] It is also consistent with reasonable concepts of culpability." (*Id.* at p. 165.) An instruction on the natural and probable consequences doctrine (CALCRIM No. 403) was not given in this case.

Further, the prosecutor never argued that Martinez aided and abetted *the intended crime of shooting at an occupied vehicle* and that murder was a "natural and probable consequence" of that shooting, or that Martinez aided and abetted the intended crime of shooting at an occupied vehicle and murder was simply a reasonably foreseeable consequence of that shooting. In fact, the prosecutor argued "[c]learly, in this case this type of murder, this type of cold-blooded murder, is murder in the first degree. You have malice, and you have it being willful, deliberate, and premeditated. [¶] Now, we know that someone like defendant Ortiz, who walks up to Frankie in the Cadillac, and pops of[f] not just one but two shots, aiming directly for his head, that's a perpetrator. That's someone who is guilty of murder in the first degree because it was done with malice, willful, deliberate, premeditated. [¶] Now, as we talked about in voir dire, who else can be just as guilty of this crime? The aider and abettor. Law says that someone who aids and abets this type of murder can be just as guilty as the perpetrator who committed it. So what is the law of aiding and abetting? You have someone who did the act. You have the perpetrator who did the shooting. You have defendant Ortiz. He did the shooting. You have an aider and abettor. You have defendant Martinez. He knew the perpetrator

14

intended to commit the murder. [¶] So the aider and abettor, one, has knowledge. That's the second element behind someone actually doing the crime, you have the person who knows about the crime, the aider and abettor. So he knew that the perpetrator intended to commit the shooting. [¶] Third element, that the aider or abettor intended to help the perpetrator before or during the murder. Okay. So the aider and abettor intended to help the perpetrator. That's the third element of aiding and abetting. [¶] The fourth element, that the aider and abettor with words or conduct did aid and abet. He did do it. Either by expressing it or actually doing something. To facilitate it, to encourage it. Clearly, that's what we have here with defendant Martinez. The planner, the one who instigated it, the one who gathered the troupes, [*sic*] the one with [*sic*] called them up, the one who wanted to do something, that is an aider and abettor. And that is what defendant Martinez did, and that is why he also, the facts of this case show, that he is guilty of first degree murder. He didn't perpetrate the crime. He didn't pull the trigger. He didn't shoot Frankie, but clearly he aided and abetted. He's just as guilty as [Ortiz]. He's just as guilty as defendant Ortiz. That's the law. That's the law that you agree to follow." Plainly, the prosecutor presented to the jury his theory that this was an express malice first degree murder i.e., that Ortiz acted willfully, deliberately, and with premeditation and it was Martinez that was the planner in this murder.

As noted, in *Chiu*, the Supreme Court held that aiders and abettors "may still be convicted of first degree premeditated murder based on direct aiding and abetting principles." (*Chiu*, *supra*, 59 Cal.4th at p. 166.) "[T]he prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Id*. at p. 167.) "An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable

15

intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*Ibid.*)

Martinez claims the error in this case stems from CALCRIM Nos. 400, 401, 520 and 521, which were given in this case. He argues they improperly told the jury that one could directly aid and abet implied malice murder. The crux of Martinez's argument is that CALCRIM No. 401 fails to advise the jury that to aid and abet an express malice murder, the aider and abettor must harbor the specific intent to kill. We are not persuaded that CALCRIM No. 401 is not a correct statement of the law regarding aiding and abetting.

As is relevant to this contention, the court instructed the jury in pertinent part as follows: "A person may be guilty of a crime in two ways. One, he may have directly [committed] the crime. I will call that person the perpetrator. Two, he may have aided and abetted a perpetrator who directly committed a crime. The person is guilty of a crime whether he committed it personally or aided and abetted the perpetrator."[12] The court went on to tell the jury that "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that, one, the perpetrator committed the crime; two the defendant knew that the perpetrator intended to commit the crime; three, before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime; and four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he knows . . . the perpetrator's unlawful purpose, and he specifically intends to and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. If all of these requirements are proved, the

---

[12] This instruction is based on CALCRIM No. 400.

16

defendant does not need to actually have been present when the crime is committed to be guilty as an aider and abettor."[13]

Thereafter, the court went on to tell the jury that "A defendant is charged in Count 1 with murder, in violation of Penal Code section 187. To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant committed an act that caused the death of another person; and two, when the defendant acted, he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought[,] expressed [*sic*] malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. The defendant acted with express malice if he unlawfully intended to kill. The defendant acted with implied malice if, one, he intentionally committed an act; two, the natural and probable consequence of the act is dangerous to human life; three, at the time he acted, he knew his act was dangerous to human life; and four, he deliberately acted in conscious disregard [for] human life."[14]

The court explained to the jury that if they decided that the defendant committed murder, "you must then decide whether it is murder of the first or second degree. The defendant is guilty of first degree murder under Penal Code section 189 if the People have proved that he acted willfully, deliberately, and premeditation [*sic*]. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice, and knowing the consequences decided to kill. The defendant acted with premeditation if he decided to kill before completing the act that caused death. [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser

---

[13] This instruction is based on CALCRIM No. 401.
[14] This instruction is based on CALCRIM No. 520.

crime.  If the People have not met this burden, you must find the defendant not guilty of first degree murder."[15]

"Even without a request, a trial court is obliged to instruct on ' "general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case" ' [citation]. . . .  In particular, instructions delineating an aiding and abetting theory of liability must be given when such derivative culpability 'form[s] a part of the prosecution's theory of criminal liability and substantial evidence supports the theory.'  [Citation.]" (*People v. Delgado* (2013) 56 Cal.4th 480, 488.)  "[T]he State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement.  [Citation.]  Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." (*Middleton v. McNeil* (2004) 541 U.S. 433, 437.)

" 'In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys.' " (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305 (*Lopez*).)  Furthermore, "[w]hen considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner. [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1229; accord, *People v. Jablonski* (2006) 37 Cal.4th 774, 831; see also *People v. Tate* (2010) 49 Cal.4th 635, 696 [applying reasonable likelihood standard to claim of instructional error or ambiguity].)[16]

_____

[15]  This instruction is based on CALCRIM No. 521.
[16]  We note that in *People v. Pearson* (2013) 56 Cal.4th 393, 476, the California Supreme Court stated that in determining the meaning the instructional charge conveys, "the question is, how would a reasonable juror understand the instruction.  [Citation.]" As authority for this proposition, the court cited *California v. Brown* (1987) 479 U.S. 538, 541.  However, in *Boyde v. California* (1990) 494 U.S. 370, 379-380, the United (continued)

" ' "Finally, we determine whether the instruction, so understood, states the applicable law correctly." [Citation.]' [Citation.] We independently assess whether instructions correctly state the law. [Citation.]" (*Lopez*, *supra*, 199 Cal.App.4th at p. 1305.) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

After independent review, we find no error. The seminal case concerning the definition of aiding and abetting as it stands currently in California is *People v. Beeman* (1984) 35 Cal.3d 547 (*Beeman*). In *Beeman*, our Supreme Court declared: "[W]e conclude that the weight of authority and sound law require proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. [Citations.] [¶] When the definition of the offense includes the intent to do some act or achieve some consequence beyond the *actus reus* of the crime [citation], the aider and abettor must share the specific intent of the perpetrator. By 'share' we mean neither that the aider and abettor must be prepared to commit the offense by his or her own act should the perpetrator fail to do so, nor that the aider and abettor must seek to share the fruits of the crime. [Citations.] Rather, an aider and abettor will 'share' the

States Supreme Court observed that a number of its cases (including *California v. Brown*, *supra*, 479 U.S. 538) had used numerous different phrasings, and made it a point to settle on the "reasonable likelihood" standard as the single standard of review for jury instructions. In *Estelle v. McGuire* (1991) 502 U.S. 62, 72, footnote 4, the United States Supreme Court reaffirmed its commitment to the "reasonable likelihood" standard, and disapproved the standard of review language contained in *Cage v. Louisiana* (1990) 498 U.S. 39, 41, which had noted, "In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole"; and *Yates v. Evatt* (1991) 500 U.S. 391, 401, which had noted, "We think a reasonable juror would have understood the [instruction] to mean . . . ." We need not decide whether our state Supreme Court misspoke in *Pearson*, since, in any event, our conclusion is unaffected.

19

perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.  [Citation.]"  (*Beeman*, *supra*, at p. 560.)

The *Beeman* court went on to say:  "[A]n appropriate instruction should inform the jury that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."  (*Beeman*, *supra*, 35 Cal.3d at p. 561.)

The definition in *Beeman* regarding aiding and abetting, and of what it means to share the perpetrator's specific intent, remains good law to this day. (See, e.g., *People v. Delgado*, *supra*, 56 Cal.4th at p. 486; *People v. Houston*, *supra*, 54 Cal.4th at p. 1224; *People v. Prettyman* (1996) 14 Cal.4th 248, 259; *People v. Marshall* (1997) 15 Cal.4th 1, 40.)  CALCRIM No. 401, as given here, adequately conveyed those principles.

Although " '[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.'  [Citation.]"  (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1122.)  "The mental state necessary for conviction as an aider and abettor . . . is different from the mental state necessary for conviction as the actual perpetrator.  [¶]  The actual perpetrator must have whatever mental state is required for each crime charged . . . .  An aider and abettor, on the other hand, must 'act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.]"  (*Id*. at pp. 1122-1123, quoting *Beeman*, *supra*, 35 Cal.3d at p. 560.)

An aider and abettor's guilt for an intended crime "is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*McCoy*, *supra*, 25 Cal.4th at p. 1117.)  Thus, the California Supreme Court has "defined

20

the required mental states and acts for aiding and abetting as: '(a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.' [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 116-117.) " 'When the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' [Citation.] What this means here, when the charged offense and the intended offense—murder . . .—are the same . . . is that the aider and abettor must know and share the murderous intent of the actual perpetrator." (*McCoy*, *supra*, at p. 1118, fn. omitted.) "Aider and abettor liability is thus vicarious only in the sense that the aider and abettor is liable for another's actions as well as that person's own actions. When a person 'chooses to become a part of the criminal activity of another, [he] says in essence, "your acts are my acts . . . ." ' [Citations.] But that person's *own* acts are also [his] acts for which [he] is also liable. Moreover, that person's mental state is [his] own; [he] is liable for [his] mens rea, not the other person's." (*Ibid*.)

In the present case, as noted, the jurors were instructed pursuant to CALCRIM Nos. 520, 521 and 401, on first and second degree murder and aiding and abetting a murder. Further, they were instructed that in order to convict appellants of first degree murder, they had to find, inter alia, intent to kill and premeditation. Moreover, the court instructed the jury on reasonable doubt and informed them that "whenever I tell you [the] People must prove something, I mean they must prove it beyond a reasonable doubt." In addition, the court instructed the jury that the "People must prove not only that the defendant did the acts charged, but also that he acted with a particular [intent] or

21

mental state"; and "The crimes and other allegations charged in this case require pro[of] of a union or joint operation of act and wrong intent."

Pursuant to CALCRIM No. 401, in order to find Martinez guilty of first degree murder based on aiding and abetting that crime, the jurors had to find beyond a reasonable doubt that someone other than Martinez (Ortiz) committed first degree murder; Martinez *knew Ortiz intended to commit first degree murder*; before or during the commission of first degree murder Martinez intended to aid and abet Ortiz *in committing first degree murder*; and Martinez's words or conduct did in fact aid and abet Ortiz's commission of first degree murder. CALCRIM No. 401 explained that Martinez aided and abetted first degree murder if he knew of the Ortiz's unlawful purpose—the commission of intentional, premeditated murder—and he specifically intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of such murder. (See *People v. Mendoza*, *supra*, 18 Cal.4th at p. 1123.)

To put it another way, when the offense is a specific intent offense such as murder, necessarily, the aider and abettor shares the specific intent of the perpetrator, i.e. to kill, when the aider and abettor knows the full extent of the perpetrator's criminal purpose—to kill the victim—and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's killing of the victim.

Certainly, CALCRIM No. 401 does not use the word "share" or explicitly state that in order for an aider and abettor to be liable for murder, he must—independently of the perpetrator—have the specific intent to kill. (See *People v. Acero* (1984) 161 Cal.App.3d 217, 224-226.) However, this does not mean there exists a reasonable likelihood the jury was misled. "Implicit in the notion of someone 'sharing' another's intent is knowledge of that intent and harboring the same purpose oneself." (*People v. Williams* (1997) 16 Cal.4th 635, 676.) What matters is not the specific words used, but rather "that the jury receive an accurate description of the required state of mind. [Citation.]" (*People v. Stallworth* (2008) 164 Cal.App.4th 1079, 1104-1105.) Here the

22

instructions conveyed that description. Since the meaning the instructions communicated to the jury was unobjectionable, "the instructions cannot be deemed erroneous. [Citation.]" (*People v. Benson* (1990) 52 Cal.3d 754, 801; accord, *People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.)

We fail to discern, in light of the evidence, the arguments of counsel, and the instructions given, how the jury could have convicted Martinez on the theory he advances. The problem with Martinez's hypothesis is that to have found him guilty of first degree premeditated murder on the theory that he aided and abetted an implied malice murder the jury would have had to have completely disregarded CALCRIM No. 401, pursuant to which the court instructed the jury that "To prove that the defendant [i.e. Martinez] is guilty of a crime based on aiding and abetting that crime, the People must prove that, one, the perpetrator [i.e. Ortiz] committed the crime [i.e. murder]; two the defendant [i.e. Martinez] *knew that the perpetrator* [i.e. Ortiz] intended to commit the crime [i.e. murder]; three, before or during the commission of the crime [i.e. murder] the defendant [i.e. Martinez] intended to aid and abet the perpetrator [i.e. Ortiz] in committing the crime [i.e. murder]; and four, the defendant's [i.e. Martinez's] words or conduct did, in fact, aid and abet the perpetrator's [i.e. Ortiz's] commission of the crime." CALCRIM No. 401 required jurors to find not only that Martinez knew of Ortiz's intent to kill, but also that Martinez *intended* to aid and abet Ortiz in committing murder. As a practical matter, logic dictates that it would be impossible for an aider and abettor to know of another's intent to commit *murder* and decide to aid in accomplishing the murder without the aider and abettor also having the intent to kill. "[E]xpress malice and an intent unlawfully to kill are one and the same." (*People v. Saille* (1991) 54 Cal.3d 1103, 1114, fn. omitted.)

Since the jury had no other way of finding Martinez guilty of first degree murder, we must presume that the jury followed this instruction as given. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852-853; *People v. Scott* (1988) 200 Cal.App.3d 1090, 1095

23

[jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions].)[17]

In sum, given the instructions, the evidence and the argument of counsel, we see no reasonable likelihood the jury applied the instructions in the manner that Martinez contends.

*Legal Definition Accomplice*

Martinez contends that the evidence could have supported a jury finding that Mendoza and Trina qualified as accomplices and that the court erred by failing to instruct the jury on the legal definition of an accomplice.[18]

---

[17] Without an instruction on the natural and probable consequence doctrine, had the jury believed that Ortiz formed the intent to kill only after he fired the first shot into the car and that the plan had just been to shoot at a Norteño car, the jury would have found Martinez not guilty of murder because as to him there would not be any union of act and intent as required by CALCRIM No. 251 [the people must prove not only that the defendant did the acts charged—aided and abetted the perpetrator's commission of the crime—here shooting at an occupied vehicle, but also acted with a particular mental state or intent—knowledge of the criminal purpose of the perpetrator]. Simply put, if the jury believed that Martinez's intent was only to aid and abet the shooting at an occupied vehicle, but after firing the first shot, Ortiz then decided to murder Sanchez, Martinez would not have known of the Ortiz's criminal purpose and had the intent to assist in achieving those unlawful ends; thus, there would be no union of act and intent.

[18] Ortiz makes a blanket statement that he joins in all applicable issues raised by Martinez. However, he explains that since Ortiz's opening brief has not been filed, he "cannot presently demonstrate that he also suffered prejudice and is entitled to relief on the grounds asserted in any such issues." As our Supreme Court has explained, "[i]t is not the task of the opposing party or this court to sort out what claims from the scores presented here are nonfrivolous as to the other defendant[] who did not identify with particularity the specific claims [he] wish[es] to join. Clearly, neither the Attorney General nor this court is required to divine which aspects of a claim might be adverse to a particular defendant, rendering him unwilling to join the particular claim at issue. *Appellate counsel for the party purporting to join some or all of the claims raised by another are obligated to thoughtfully assess whether such joinder is proper as to the specific claims and, if necessary, to provide particularized argument in support of his or her client's ability to seek relief on that ground.* If a party's briefs do not provide legal argument and citation to authority on each point raised, ' "the court may treat it as (continued)

24

Martinez maintains that had the jury received such an instruction, the jury would have known to disregard Mendoza and Trina's testimony absent corroborating independent evidence that did not originate from another accomplice.

Section 1111 provides that a "conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." An "accomplice" is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) "A witness is liable to prosecution within the meaning of section 1111 if he or she is a principal in the crime." (*People v. Hinton* (2006) 37 Cal.4th 839, 879.) A principal includes those who "directly commit the act constituting the offense" and those who "aid and abet in its commission." (§ 31.) An accessory after the fact (§§ 32, 33) is not a principal and therefore not an accomplice. (*People v. Balderas* (1985) 41 Cal.3d 144, 193-194, fn. 22.)

"Accomplice status is a question of fact for the jury unless the evidence permits only a single inference. [Citations.]" (*People v. Sully* (1991) 53 Cal.3d 1195, 1227-1228.) Martinez must establish Mendoza and Trina's accomplice status by a preponderance of the evidence.

The evidence does not support an inference of accomplice liability on Mendoza or Trina's part. At best the evidence raises the suspicion that they may have become aware of Martinez's criminal purpose by eavesdropping on the plan that was being formulated by Martinez, Ortiz, Prado, and Montejano to shoot a Norteño, but we find nothing in the record to support the conclusion that they aided and abetted the crimes; we find nothing

---

waived, and pass it without consideration. [Citations.]" ' [Citation.] 'Joinder may be broadly permitted [citation], but each appellant has the burden of demonstrating error and prejudice [citations].' [Citation.] We strongly disapprove of this seriously improper tactic." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363-364, italics added.)

25

from which a jury could conclude that Mendoza and Trina acted with knowledge of the criminal purpose of Martinez, Ortiz, Prado and Montejano and with an intent or purpose either of committing or encouraging Martinez, Ortiz, Prado, and Montejano to commit the crimes.[19] Mere knowledge and acquiescence do not suffice to establish aiding and abetting liability. (See *Beeman*, *supra*, 35 Cal.3d at pp. 559-560; *People v. Stankewitz* (1990) 51 Cal.3d 72, 91 [presence during planning and execution of the offenses and failure to prevent their commission insufficient to establish aiding and abetting liability].)

In short, as to Mendoza and Trina, sua sponte accomplice instructions were not required. (*People v. Rodriguez* (1986) 42 Cal.3d 730, 761.)

*Alleged Abuse of Discretion—Failure to Inquire into Jail Incident*

Ortiz argues the court "denied [him] his Sixth Amendment right to confront witnesses and abused its discretion under Evidence Code section 352 by precluding the cross-examination of two accomplice-witnesses about whether they had conferred and planned a co[]ordinated attack on an inmate while in the same jail pod as circumstantial evidence supporting a reasonable inference and argument they had similarly co[o]rdinated their testimony incriminating" [him]. Martinez joins in this argument, but adds no substantive argument on his own behalf.

*Background*

While cross-examining Prado, Martinez's counsel began asking him about his incarceration at the Monterey County jail. Prado explained that he had been in jail for two years in a section of the jail called "A-pod." Defense counsel established that Montejano had been in the same pod. Prado explained that although he spent 23 hours a day in an individual cell, he was allotted one hour to go outside; at times he used that hour to go to Montejano's cell and talk to him. Martinez's counsel asked Prado whether

---

[19] Contrary to Martinez's assertion, nothing in the record suggests that Trina had responded with her approval of the plan to shoot a Norteño.

26

he and Montejano had beaten up another jail inmate on August 10, 2012, a little over two months before the trial. The prosecutor objected and an off-the-record conversation ensued. The court sustained the objection and granted the prosecutor's motion to strike.

Before the jury returned from the lunch recess, on the record, the parties discussed what had transpired in the off-the-record conversation at the time of the prosecutor's objection. Ortiz's counsel explained that they learned of an incident at the county jail where Prado and Montejano began attacking a third individual while all the members of A-pod were standing in line to be counted. Ortiz's counsel explained that they had considered this evidence for impeachment purposes under a moral turpitude theory. He suggested, however, that it should be considered to show more than just the opportunity for Montejano and Prado to communicate, but to show that they were "associating to the degree of planning . . . ." Ortiz's counsel claimed that evidence of post-crime collaboration would help the defense explain why Prado and Montejano's statements were similar.

The court asked counsel whether any communication between Prado and Montejano was audible before the attack. Ortiz's counsel stated, "Not reflected in the reports given." The prosecutor opposed the request to inquire into the jail incident on Evidence Code section 352 grounds; he argued that the testimony would be more prejudicial than probative. The court ruled that it was going to exclude the evidence under Evidence Code section 352, because the inquiry would be time consuming and not particularly probative given that Prado had already given testimony that he had had the ability to communicate with Montejano and had done so over the past two years.

On redirect examination, the prosecutor asked Prado whether he had contrived his story with Montejano while in jail; Prado maintained that he had not. When asked why he had not talked with Montejano about the case, Prado could not explain it other than to say that they had never talked about it because it was not the sort of thing that he wanted to talk about with others, and his attorney told him not to talk about the case to anyone.

27

He explained that he talked to the prosecutor and the prosecutor's investigators because the prosecutor had told him that he could get a good deal if he told the truth.

Later, when Montejano took the stand, Martinez's counsel elicited testimony that Montejano had been in the same pod as Prado for over two years. Montejano confirmed that he was able to leave his cell for one hour every day and that he could visit any inmate in the pod during that hour by going up to his cell and talking to him at the door. He acknowledged that Prado had visited him and that he had visited Prado. Similar to Prado, Montejano said that he never talked about the case.

Generally, "the ordinary rules of evidence do not infringe on a defendant's right to present a defense. [Citation.] Trial courts possess the 'traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.' [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 945, disapproved on another point by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Hawthorne* (1992) 4 Cal.4th 43, 57-58.)

" 'Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.] California law is in accord. [Citation.] Thus, unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.' [Citation.]" (*People v. Lucas* (2014) 60 Cal.4th 153, 271.)

"The trial court has broad discretion to determine the relevance of evidence [citation], and we will not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner [citation]." (*People v. Jones* (2013) 57 Cal.4th 899, 947.)

We find no abuse of discretion and no impingement on appellants' confrontation clause rights.

Here the probative value of the jail fight was minimal given that both Prado and Montejano testified that they had the opportunity to, and had over the previous two years, talked with each other. The fact that Prado and Montejano had conspired together to attack another inmate, if it was in fact true, provides little insight into whether they had conspired to plan their stories in order to testify consistently that it was Ortiz that shot Sanchez and it was Martinez who wanted to retaliate against the Norteños. Any evidence on whether Prado and Montejano could collaborate to lie, as opposed to whether they would, was already amply covered by their own testimony that they had daily access to each other.

Assuming for the sake of argument that actual planning had occurred in the attack on the jail inmate, it does not make actual planning in pursuit of another goal any more likely. The amount of time that it would have taken to establish that there was actual planning in the jail attack would have been extremely time-consuming; witnesses would have had to be called to testify that Prado and Montejano were colluding together before the fight and the circumstances of the fight would have had to be established—who started it, who was the other inmate, and how did it start.

In sum, the probative value of the evidence, even if it could have been established, was minimal and the consumption of time great.

As previously stated, in order to prove that the error was in violation of the Sixth Amendment's confrontation clause, appellants must demonstrate that the prohibited cross-examination would have produced "a significantly different impression of [the witness's] credibility." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 (*Van Arsdall*.)

The jurors already knew that Prado and Montejano had the opportunity to conspire to come up with consistent stories and that they had been arrested for Sanchez's murder. The only reason that they were testifying was that the prosecution had offered deals for

their truthful testimony. The jurors witnessed very detailed cross-examination and recross-examination of both Montejano and Prado in which defense counsel attacked their credibility and established that they were gang members/associates who had participated in a gang murder. Given the jurors' knowledge that Montejano and Prado were actively trying to avoid a murder prosecution, evidence that they may have conspired together to attack another jail inmate would not have produced a "significantly different impression" of their credibility. Therefore, even if we were to assume for the sake of argument that the trial court's ruling was erroneous, it did not have the effect of violating appellants' rights under the Sixth Amendment. (*Van Arsdall*, *supra*, 475 U.S. at p. 680.)

*Alleged Abuse of Discretion—Admission of Mendoza's Prior Consistent Statements*

Ortiz argues that the court erroneously allowed the prosecutor to admit Mendoza's statements from the preliminary hearing under the prior consistent statement exception to the hearsay rule. Martinez joins in this argument.[20]

Ortiz maintains that the admission of this testimony deprived him "of a fundamentally fair trial guaranteed by due process."

Generally, a prior statement that is consistent with trial testimony is inadmissible hearsay if offered to support the trial testimony. (Evid.Code, §§ 791, 1236; *People v. Riccardi* (2012) 54 Cal.4th 758, 802.) However, an exception to this rule applies if there has been a claim that a witness's trial testimony "is recently fabricated or is influenced by bias or other improper motive, and the [prior consistent] statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Evid.Code, § 791, subd. (b).) Under such circumstances, the prior consistent statement is relevant to establish that the current statement is truthful.

---

[20] Again, Martinez joins in Ortiz's argument but adds no substantive argument of his own.

30

Ortiz maintains that the prosecution introduced Mendoza's preliminary examination testimony to rebut implications made on cross examination by his attorney that Mendoza was biased toward him and had fabricated her statements to blame him for the murder. Ortiz alleges, however, that the court erred by failing to recognize that the evidence did not satisfy the foundational requirements because the basis for her claimed motive and bias to fabricate arose *before* she made the statements at the preliminary hearing.

We begin our analysis with the standards of review. First, "an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) Second, under Evidence Code section 353, subdivision (b), an erroneous ruling shall be set aside only when the error complained of resulted in a "miscarriage of justice." And a " 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836(*Watson*).)

We note that defense counsel objected to the prosecutor's eliciting from Mendoza her preliminary hearing testimony on the ground that some statements were not prior consistent statements; and that defense counsel had raised no accusation of fabrication or bias with respect to particular statements that the prosecutor was trying to bring in as prior consistent statements.

No procedural principle is more familiar than the forfeiture rule. A judgment shall not be reversed for an evidentiary error unless a timely objection was interposed on the same ground that is asserted on appeal. (Evid. Code, § 353, subd. (a).) The contemporaneous objection rule applies to claims of state and federal constitutional error. (*People v. Daniels* (2009) 176 Cal.App.4th 304, 320, fn. 10.) The objection requirement

is necessary because a contrary rule "would deprive the People of the opportunity to cure the defect at trial and would 'permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal.' [Citation.]" (*People v. Rogers* (1978) 21 Cal.3d 542, 548.) "Specificity is required both to enable the court to make an informed ruling on the motion or objection and to enable the party proffering the evidence to cure the defect in the evidence." (*People v. Mattson* (1990) 50 Cal.3d 826, 854.)

We have carefully examined the lengthy trial record. At no point did defense counsel make any comments that can fairly be said to have raised the issue that the foundational requirement—that the prior consistent statement be made before the bias, motive for fabrication, or other improper motive is alleged to have arisen—was not satisfied.

Finally, even if this issue is preserved for review, and even if the trial court erred in allowing the prosecutor to elicit portions of Mendoza's preliminary hearing testimony, appellants cannot show that they were prejudiced thereby. The additional evidence of appellants' guilt of the charged offenses was extremely strong. Trina corroborated much of Prado and Montejano's testimony. She testified that she heard Martinez express his desire to "hunt" in retaliation for the Norteños' shooting at Smiley's house; and that he began telephoning other Sureños to recruit their help in that task. This corroborated Prado's claim that Martinez had talked to him and another Sureño about his proposal to retaliate against Norteños for shooting at a friend's house. Trina corroborated Prado and Montejano's testimony that there was a girl in the apartment when the four men were on the other side of the partition planning the shooting; Trina testified that she had been in Mendoza's apartment on one side of the partition while the four men—Martinez, Ortiz, Prado and Montejano—were on the other side. In addition, Trina testified that she had seen the men handling a revolver and a larger gun; heard discussions about how Martinez would take one car and Prado the other; and saw all four men leave as Martinez told her

32

and Mendoza that he would return after going to "hunt." All this testimony corroborated Prado and Montejano's testimony that Martinez had taken out two guns fitting that description; that they had passed around the guns while deciding who was going to do the shooting and who would go in each car; and that everyone knew that they were going out to shoot a Norteño.

Finally, Trina testified that when the men returned they were happy and excited and Ortiz identified himself as the shooter by reenacting the shooting and saying that he had "aimed straight for his head." This corroborates Montejano's testimony that he saw Ortiz shoot Sanchez and that those who returned to Martinez's apartment were excited and ready to celebrate. Further, it corroborates Prado's testimony that Martinez was proud of the shooting, so much so that he became offended when another Sureño gang tried to take credit for the shooting.

In light of this overwhelming evidence of appellants' guilt, the error was harmless under either the *Watson* standard (*Watson*, *supra*, 46 Cal.2d at p. 836) for assessing the prejudicial effect of state error or the *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18, 24) for evaluating the prejudicial effect of federal constitutional error.

*Cumulative Error*

Martinez argues that the cumulative effect of the aforementioned errors requires that we reverse his conviction.[21] He argues that each error that he has asserted bore on the "individual and collective credibility" of Prado, Montejano, Mendoza and Trina; each error either improperly "enhanced the witnesses' credibility . . . or permitted testimony to be accepted without reference to 'accomplice corroboration' and 'accomplice distrust' principles."

---

[21] Again, we note that Ortiz makes a blanket statement that he joins in all applicable issues raised by Martinez—something that is not sufficient for this court to conduct a review on his behalf. (*People v. Bryant*, *Smith and Wheeler*, *supra*, 60 Cal.4th at pp. 363-364.)

Reversal based on cumulative error is required only if a high number of instances of error occurring at trial creating a strong possibility that "the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone." (*People v. Hill* (1998) 17 Cal.4th 800, 845 (*Hill*).) For instance, in *Hill* at pages 844 through 847, the court concluded that the cumulative impact of constant and outrageous misconduct by the prosecutor and several legal errors occurring at trial "created a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors." (*Id.* at p. 847.)

Certainly, " '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) The combined effects of multiple errors may indeed render a trial fundamentally unfair. (See *People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.) However, as discussed *ante*, since we have found none of Martinez's claims of error meritorious or prejudicial, a cumulative error argument cannot be sustained. No serious errors occurred, which, whether viewed individually or in combination, could possibly have affected the jury's verdict. (*People v. Martinez* (2003) 31 Cal.4th 673, 704; *People v. Valdez*, *supra*, 32 Cal.4th at p. 128.) Simply put, since we have found no substantial error in any respect, Martinez's claim of cumulative prejudicial error must be rejected. (*People v. Butler* (2009) 46 Cal.4th 847, 885.) Martinez was entitled to a fair trial, not a perfect one. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057.)

*Sufficiency of the Evidence—the Primary Activities Element*

Ortiz argues that the evidence was insufficient to support either his conviction on count 3 for active participation in a street gang (§ 186.22, subd. (a)) or the true finding as to the street gang enhancement (§ 186.22, subd. (b)). Ortiz asserts that the prosecution failed to establish the required element that the Sureños engaged in any of the statutorily

enumerated primary activities as one of the gang's chief and principal activities rather than on an occasional basis. Martinez joins in this argument.

*Background*

Salinas Police Officer Masahiro Yoneda testified as a gang expert. In addition to being familiar with the Salinas area, having grown up there, Officer Yoneda had worked as a school resource officer and a probation officer, and at the time of trial he was in the gang intelligence unit. Regularly, he interviewed gang members and kept up to date with gang trends in Salinas.

Officer Yoneda explained that he prepares gang reports as part of his work; he documents defendants' gang tattoos, prior contacts with other gang members, clothing, the crimes at issue, and other indications of gang involvement in order to make determinations as to whether any given defendant is an active participant in a criminal street gang. He said that he had conducted "easily over a hundred" on "the street" criminal street gang investigations.

Based on his experience and training, Officer Yoneda testified generally that gangs possess weapons and engage in shootings, homicides, assaults with a deadly weapon, and shooting into occupied vehicles.

Officer Yoneda explained that there is a "two-gang dynamic between the Norteños and the Sureños" in Salinas and that "[i]t's all about retaliation." He said that the Sureños started as a form of protection from the Norteños. Officer Yoneda told the jury that retaliation and intimidation are important to Norteños and Sureños because they gain respect from other gangs and discourage third parties from reporting the crimes that the gangs commit. As far as retaliation and intimidation are concerned, the method used is generally drive-by shootings and "walk up style" whereby the gang member walks up to the intended victim and shoots at very close range.

Officer Yoneda explained that Norteños and Sureños share the same principles when it comes to dealing with drop-outs; drop-outs are considered "no good" and are

35

"green-lighted" meaning placed on a hit list so that any gang member is authorized to kill the drop-out.

When asked by the prosecutor whether he personally knew about cases where gang members had taken a plea deal to testify against fellow gang members, Officer Yoneda described a homicide case wherein four gang members retaliated against a Norteño for a shooting attempted on Ortiz. One of the gang members fired multiple shots at the victim, killing him.

The prosecutor asked Officer Yoneda whether he was familiar with two Sureño gang members, Valentin Rivas and Benjamin Carrillo. Officer Yoneda confirmed that he was familiar with their case in which they had committed a murder. Officer Yoneda explained that Rivas and Carrillo were in a vehicle when they pulled up beside a person they perceived to be a Norteño gang member; they asked where the person was from and he replied Norte. Rivas opened fire and killed the victim. The prosecutor produced a certified copy of the court documents (exhibit 111) in the case that showed that in 2011, Rivas and Carrillo were both found guilty of murder and shooting at an occupied vehicle that occurred in 2009.

Next the prosecutor asked Officer Yoneda whether he was familiar with Sureño gang member Germaine Maravillo; the officer confirmed that he was familiar with him and the crime he committed in 2008. Officer Yoneda said that the police were called to a shooting where there were two people that were the intended victims. The victim, who was shot in the leg, was a Norteño gang member or associate. The prosecutor produced a certified copy of the court documents in the case (exhibit 112) that showed that in 2009, Maravillo was charged with attempted murder and shooting a firearm from a vehicle and that Maravillo pleaded guilty to attempted murder.

The prosecutor asked Officer Yoneda whether he was familiar with two Sureño gang members, Juan Bautista Vega and Jose Luis Torres, who in 2007 committed a violent crime. Officer Yoneda confirmed that he was familiar with the case and

36

described the crime as a drive-by shooting. The prosecutor produced a certified copy of the court documents (exhibit 113) in the case that showed that in 2007 both Vega and Torres pleaded guilty to assault with a firearm.

Then the prosecutor asked Officer Yoneda whether he was familiar with another Sureño gang member, Alejandro Ramirez Hipolito. Officer Yoneda confirmed that Hipolito had committed a gang-related crime on July 3, 2005, in which Hipolito opened fire on the victim as the victim was walking to his car. Hipolito was charged with attempted murder with gang enhancements. Again the prosecutor produced a certified copy of the court documents in the case (exhibit 114) which showed that Hipolito pleaded guilty to one count of attempted murder and was sentenced to 17 years in state prison.

Finally, the prosecutor asked Officer Yoneda whether he was familiar with Sureño gang member Uriel Loya Martinez; Officer Yoneda confirmed that he was. He described an incident in which Loya Martinez was driving a car with a juvenile as a passenger; they motioned for who they suspected was a Norteño gang member to approach the car. As the victim reached the car, the juvenile opened fire with a shotgun, but missed. The car then went down the street, made a U-turn, and returned. The victim was going toward his house as an additional shot was fired at him. Loya Martinez was charged with attempted murder with a gang enhancement. Again, the prosecutor produced a certified copy of the court documents in the case (exhibit 115) which showed that Loya Martinez pleaded no contest to one count of attempted murder, admitted the gang allegation, and was sentenced to 15 years in state prison.[22]

The court instructed the jury that for the purpose of determining whether a group qualifies as a criminal street gang, the jury could consider murder, attempted murder, shooting at an occupied vehicle or vehicle theft as qualifying "primary activit[ies]."

---

[22] Exhibit Nos. 111, 112, 113, 114, 115 were admitted into evidence.

Section 186.22, subdivision (f) defines the term "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its *primary activities* the commission of one or more of the [33] criminal acts" specified in subdivision (e) of section 186.22, has "a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Italics added.)

Subdivision (e) of section 186.22 defines a "pattern of criminal gang activity" as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more" enumerated offenses, "provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons."

In *People v. Duran* (2002) 97 Cal.App.4th 1448 (*Duran*), the court summarized the law in this area. "Section 186.22, subdivision (b)(1) imposes additional punishment when a defendant commits a felony for the benefit of, at the direction of, or in association with a criminal street gang. To establish that a group is a criminal street gang within the meaning of the statute, the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. [Citations.]" (*Id*. at p. 1457.)

The *Duran* court explained that " 'The phrase "primary activities," as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes be one of the group's "chief" or "principal" occupations. [Citation.]' [Citation.] Proof that a gang's members consistently and repeatedly have committed criminal activity listed in section 186.22, subdivision (e) is sufficient to establish the gang's primary activities. On the other hand, proof of only the occasional commission of crimes

38

by the gang's members is insufficient. [Citation.] Past offenses, as well as the circumstances of the charged crime, have some tendency in reason to prove the group's primary activities, and thus both may be considered by the jury on the issue of the group's primary activities. [Citation.]" (*Duran*, *supra*, 97 Cal.App.4th at pp. 1464-1465.) Further, "[t]he testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities." (*Id*. at p. 1465)

Ortiz argues that as best as he "can determine, Toneda [*sic*] never testified about or offered a specific opinion[,] which identified or enumerated the 'primary activities' of the Sureños. The only evidence arguably germane to that element of the street gang definition, the records of conviction of one murder and four attempted murders committed from July 3, 2005 through January 12, 2009, was offered as predicate offenses to prove the 'pattern of gang activity' element. . . . [¶] Thus, the record lacks substantial evidence of any enumerated crimes which Sureños, as a gang, consistently and repeatedly commit as the gang's primary activities. Moreover, the expert never expressly opined about any such activities. At most, [Yoneda] impliedly testified the gang satisfied that element of the statutory definition by his conclusory, and circular, opinion that it met the definition."

Relying on *People v. Perez* (2004) 118 Cal.App.4th 151, *In re Nathaniel C.* (1991) 228 Cal.App.3d 990, and *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*), Ortiz argues that neither the quality nor the quantity of the evidence presented below on the primary activities element differed significantly from these cases. Therefore, proof of the primary activities element was deficient and cannot support the verdict. Respectfully, we disagree.

39

This is not a case where the prosecution sought to rely on a single offense committed years before the current crime, as in *People v. Perez, supra*,118 Cal.App.4th 151. Nor is it a case, as in *In re Nathanial C., supra*, 228 Cal.App.3d at page 1004, where the gang expert testified that a primary activity of the gangs in his area was to commit crimes, and enumerated the crimes he had in mind; however, only one of those crimes qualified for the gang enhancement.

In *Alexander L.*, the gang expert's testimony was as follows: "At trial, Lang testified as a gang expert. He testified generally about the benefits graffiti might create for a gang, such as intimidating rivals. He also stated his opinion that Varrio Viejo was an active street gang as of the date of [the defendant's] arrest. When asked about the primary activities of the gang, he replied: 'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.' No further questions were asked about the gang's primary activities on direct or redirect examination." (*Alexander L., supra*, 149 Cal.App.4th at p. 611.) The Court of Appeal concluded the gang expert's testimony was inadequate, explaining: "Lang's entire testimony on this point is quoted above—he 'kn[e]w' that the gang had been involved in certain crimes. No specifics were elicited as to the circumstances of these crimes, or where, when, or how Lang had obtained the information. He did not directly testify that criminal activities constituted Varrio Viejo's primary activities. Indeed, on cross-examination, Lang testified that the vast majority of cases connected to Varrio Viejo that he had run across were graffiti related." (*Id.* at pp. 611-612, fn. omitted.) The expert testimony in *Alexander L.* differed from the expert testimony here, in a significant way. The prosecutor in *Alexander L.* failed to establish the foundation as to where, when, and how the expert obtained the information he used to formulate his opinion. (*Id.* at p. 612.) Here, Yoneda described six incidents, supported by documentary evidence, resulting in the convictions of Sureño gang members for

40

murder and attempted murder spanning a period of four years before the current crimes, showing that the groups' members *consistently and repeatedly* had committed criminal activity listed in the gang statute. Further, as to the details of the crimes, Yoneda testified to where, when, and how he obtained information on gang crimes—from talking to gang members and conducting over a hundred criminal street gang investigations.

The picture Yoneda painted for the jury was of two gangs, formed to protect their members, whose principal characteristic was that they were at war with each other—that is, engaging in acts of retaliation. While engaged in this conflict, members of the gang of which Ortiz and Martinez were members committed attempted murders, murders, and shootings at occupied vehicles. The record evidences what are essentially seven skirmishes in this war: four unnamed gang members killing a Norteño for shooting at Ortiz (murder); Rivas and Carrillo shooting at an occupied vehicle and killing a Norteño (murder); Marvillo shooting a perceived Norteño gang member/associate in the leg (attempted murder); Vega and Torres shooting from a vehicle at a perceived Norteño gang member (attempted murder); Hipolito shooting at a victim as he was walking to his car (attempted murder); Loya Martinez and a juvenile twice shooting at the same victim (attempted murder); and finally, the shooting of Sanchez, the victim in this case (murder and shooting at an occupied vehicle). Thus, Officer Yoneda explicitly described the activities of several gang members that fit into his general description of Sureño members engaging in retaliation against Norteño gang members. The fact that Officer Yoneda did not specifically testify that the Sureño gang's primary activities include murder, attempted murder and shooting at occupied vehicles is of no moment. The jury could rationally have concluded this from the evidence set forth above.[23]

---

[23] Murder, attempted murder, and shooting at an occupied vehicle are among the statutorily enumerated criminal offenses to which the enhancement applies. (§ 186.22, subds. (e)(3), (e)(5).)

In sum, this evidence is sufficient to support the jury's finding that the primary activities of the gang to which Ortiz and Martinez belonged were among the required statutorily enumerated offenses.

*Sufficiency of the Evidence a Firearm Was Discharged by a Principal*

Martinez contends that this court should reverse the "firearm discharge by a principal" finding with respect to him because he no longer qualifies as a "principal" for purposes of the allegation under section 12022.53, subdivision (a)(1).

Section 12022.53, subdivision (d) provides for an enhanced punishment for any person who, in the commission of a murder, personally and intentionally discharges a firearm and proximately causes death to any person other than an accomplice. (Stats. 2010 ch.711 § 5, operative January 1, 2012.) Subdivision (e) of section 12022.53 extends the applicability of the enhancement to "any person who is a principal" in the commission of the offense provided that (1) the person violated subdivision (b) of section 186.22 and (2) "any principal in the offense committed any act specified in subdivision (b), (c), or (d)."[24]

Martinez's argument is based on his assertion that because there was an evidentiary shortfall in the primary activities element of section 186.22, subdivision (b)(1), the section 12022.53 subdivisions (d), (e)(1) enhancement cannot stand.

Since we have found the jury's finding that the primary activities of the gang to which Ortiz and Martinez belonged were among the required statutorily enumerated offenses, Martinez's argument on this issue cannot stand.

---

[24] Personal use of firearm in the commission of a murder is specified in subdivision (b) of section 12022.53, personal and intentional discharge of a firearm in the commission of a murder is specified in subdivision (c), and personal and intentional discharge of a firearm that proximately causes death in the commission of the crime of shooting at an occupied vehicle is specified in subdivision (d).

*Clerical Errors in the Abstract of Judgment*

Martinez asserts that his abstract of judgment contains errors that must be corrected. Specifically, he maintains that his sentence on the murder count was 25 years to life and not 50 years to life, the sentence on the shooting at an occupied vehicle count was 15 years to life and not 32 years to life, and the sentence on the gang participation count was three years and not seven years as the abstract of judgment reflects.

Since, for reasons that follow, we must return this case to the trial court for resentencing on count 2 (shooting at an occupied vehicle), most of Martinez's issues are moot. Any discrepancies in the original abstract of judgment can be addressed to the trial court at resentencing to be corrected in a new abstract of judgment.

With respect to Martinez, as to the shooting at an occupied vehicle count (count 2) the court imposed a sentence of 25 years to life for the discharge of a firearm enhancement to run concurrently with count 1.[25] However, the court stayed the sentence. Martinez's abstract of judgment reflects a sentence of "32 years to Life on count 2" "PLUS enhancement time shown above." In imposing the sentence on count 2 the court did not impose a term from the triad of three, five or seven years for the underlying crime of shooting at an occupied vehicle. (§ 246) The People argue that "the structure of the court's reasoning at sentencing and the margin notes in the court's copy of the district attorney's sentencing memorandum clearly imply that the court imposed a seven-year base term." The problem with the People's argument is that we cannot be sure that the notes were written by the sentencing judge. The court minutes from the sentencing hearing reflect that on count 2 the court imposed the upper term of seven years. The general rule is that oral pronouncements of the court are presumed correct and prevail over any discrepancy in the court's minute orders. (*People v. Mesa* (1975) 14 Cal.3d

---

[25] The court imposed this sentence under section 12022.53, subdivisions (d), (e)(1) and (e)(2).

43

466, 471.) However, when the record is in conflict and cannot be harmonized, " ' "that part of the record will prevail, which, because of its origin and nature or otherwise, is entitled to greater credence . . . ." ' " (*People v. Thompson* (2009) 180 Cal.App.4th 974, 978, quoting *People v. Smith* (1983) 33 Cal.3d 596, 599.)

In imposing sentence on Martinez on count 2, the court asked the prosecutor if he had "a position as to whether or not that should be deemed as an enhancement to be applied in addition to a term in the triad?" The prosecutor stated that he thought it was "the underlying" term; that it was not an "actual enhancement." The court asked Martinez's counsel if he had "an opinion as to whether or not . . . the Court needs to impose a term in the triad for the 246?" Martinez's counsel responded "No." It appears that the court was persuaded by the prosecutor's statements and as noted, the court did not impose a sentence for the underlying crime of shooting at an occupied vehicle. True to its namesake, an enhancement *enhances* the punishment for an offense—here the underlying offense of shooting at an occupied vehicle. "The statute [section 12022.53] makes clear that these enhancements are to be added to the base term for the crime. Each of the three enhancement provisions of section 12022.53—that is, subdivisions (b), (c) and (d)—states in relevant part that '[n]otwithstanding any other provision of law,' the defendant '*shall* be punished by *an additional and consecutive* term of imprisonment in the state prison for' 10 years, 20 years, or 25 years to life, as applicable. [Citation.]" (*People v. Chui* (2003) 113 Cal.App.4th 1260, 1263; accord, *People v. Shabazz* (2006) 38 Cal.4th 55, 68.) Accordingly, we must return this case to the trial court to resentence Martinez on count 2.[26]

---

[26] Again, we note that Ortiz makes a blanket statement that he joins in all applicable issues raised by Martinez—something that is not sufficient for this court to conduct a review. (*People v. Bryant, Smith and Wheeler, supra*, 60 Cal.4th at pp. 363-364.)

44

Ortiz points out that in his abstract of judgment the sentence on the street gang participation count (count 3) is reflected as seven years, but should be only three years. The People concede the issue. In sentencing Ortiz on count 3, the court imposed "the upper term of three years . . ." We will order Ortiz's abstract of judgment be amended to reflect a three-year prison term on count 3.

*Custody Credits*

At sentencing, the trial court believed that both Martinez and Ortiz were not entitled to "any credits" against their sentences. Accordingly, the court failed to award appellants any presentence custody credit. Appellants claim that they are entitled to presentence custody credit for actual days served. (§ 2900.5, subd. (a).) The People concede the point, and we accept the well-taken concession. Section 2933.2 provides that convicted murderers are not entitled to credits pursuant to sections 2933 and 4019, but those provisions concern work time credits and conduct credits. They do not address presentence custody credits for actual time served. (*People v. Taylor* (2004) 119 Cal.App.4th 628, 646 (*Taylor*); *People v. Johnson* (2010) 183 Cal.App.4th 253, 289 (*Johnson*).) Section 2900.5 awards credit to a defendant for all days spent in custody. This provision applies to all defendants. (*Taylor, supra,* at p. 647; *Johnson, supra,* at p. 289.)

Accordingly, we reverse the judgment and remand the matter to the trial court so that it can fulfill its statutory duty to determine the number of days spent in presentence custody to be credited upon Martinez's and Ortiz's terms of imprisonment. (§ 2900.5, subds.(a), (d).)[27]

---

[27] Ortiz claims that he is entitled to presentence credit for time he spent in jail predating the murder. The probation officer's report indicates that Ortiz spent time in custody of 35 actual days for violations of his probation in other cases. "[W]here a period of presentence custody stems from multiple, unrelated incidents of misconduct, such custody may not be credited against a subsequent formal term of incarceration if the prisoner has not shown that the conduct which underlies the term to be credited was also (continued)

*Disposition*

The judgment is reversed and remanded to the lower court for the limited purpose of resentencing Martinez on count 2 (shooting at an occupied vehicle) and to calculate Martinez's and Ortiz's custody credits. As to Ortiz, the abstract of judgment is ordered modified to reflect a sentence of three years (stayed) in state prison on count 3.

---

a 'but for' cause of the earlier restraint." (*People v. Bruner* (1995) 9 Cal.4th 1178, 1193-1194.) Logically, it would be impossible for Ortiz to prove that custody time that predated the murder was a "but for" cause of this earlier restraint.

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.


_____

PREMO, J.